# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

RAMON DEMETRIUS HARPER,

    Petitioner,

vs.

KRISTOPHER KARBERG,

    Respondent.

No. C22-64-LTS-KEM

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

This matter is before me on a motion (Doc. 16) by respondent Kristopher Karberg to dismiss petitioner Ramon Harper's amended application (Doc. 9) for a writ of habeas corpus under 28 U.S.C. § 2254. Harper has filed a response. Doc. 20. Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

### A. *State Court Conviction and Sentence*

In November 2011, following a two-week jury trial, Harper was convicted of attempt to commit murder, willful injury causing serious injury, going armed with intent and flight to avoid prosecution in violation of Iowa Code §§ 707.11, 708.4(1), 708.8 and 719.4(4). *Harper v. State,* 978 N.W.2d 99 (Table), 2022 WL 1100280,*1 (Iowa Ct. App. Apr. 13, 2022). The Iowa Court of Appeals summarized the facts and trial proceedings as follows:

> After Harper entered a convenience store, he walked directly to Domonique Turner. Several witnesses in the convenience store testified Harper repeatedly hit Turner in the head with a rubber mallet, including repeated blows to the head during the time Turner lay helpless on the tile floor. Harper stopped the blows to Turner's head only when bystanders and the

store manager intervened. The convenience store's videotape showing the incident was played for the jury. When his assault was interrupted, Turner exited the store, entered his girlfriend's car, immediately left the area, and then left the state. Due to Turner's severe head injury, he was transported by helicopter to an Iowa City hospital for immediate neurosurgery. Prior to the assault, Harper believed Turner took a portion of the money Harper had given Turner's girlfriend for safekeeping. Additionally, one witness testified on the *day after* Harper assaulted Turner, the witness saw a "regular" claw hammer on the backseat of Turner's girlfriend's car.

. . .

During closing arguments, defense counsel admitted Harper struck Turner with a rubber mallet but argued Harper did not have the specific intent to kill Turner. Counsel asserted the evidence only supported the offense of "assault causing a serious injury."

*State v. Harper,* 838 N.W.2d 680 (Table), 2013 WL 3830193 (Iowa Ct. App. July 24, 2013). The Iowa District Court sentenced Harper to a prison term not to exceed 25 years, with a minimum of 70 percent to be served. Doc. 14-3 at 7.

### B. Direct Appeal

Harper appealed, claiming there was "insufficient evidence he specifically intended to cause the death of Turner." *Harper*, 2013 WL 3830193, at *1 (Iowa Ct. App. July 24, 2014); *see also* Doc. 14-5 at 1. The Iowa Court of Appeals affirmed. *Harper,* 2013 WL 3830193, at *2. Harper applied to the Iowa Supreme Court for further review but the application was denied on October 1, 2013. Doc. 14-2 at 1.

### C. PCR Application

On October 29, 2013, Harper applied for post-conviction relief (PCR) in the Iowa District Court based on the following claims: (1) his counsel's concession that it was Harper who assaulted Turner deprived him of his right to control his own defense at trial; (2) the composition of the jury panel violated his right to a jury drawn from a fair cross-

2

section of the community; (3) the State engaged in purposeful racial discrimination in jury selection; and (4) his counsel was ineffective. *Harper*, 2022 WL 1100280 at *1.

The District Court denied the fair cross-section claim on the State's motion and denied the other claims after a hearing. *Id*. The Iowa Court of Appeals affirmed the denials. *Id*. at *11. The Iowa Supreme Court denied further review and procedendo issued on June 10, 2022. Doc. 14-10.

### D.     *Federal Habeas Petition*

Harper mailed his habeas petition (Doc. 1) to this court on June 30, 2022, and it was filed on July 6, 2022. Doc. 1. He filed an amended petition (Doc. 9) on February 23, 2023. The amended petition raises two distinct claims: (1) violation of *McCoy v. Louisiana,* 138 S. Ct. 1500 (2018), because Harper's counsel conceded guilt against Harper's wishes; and (2) violation of *Batson v. Kentucky,* 476 U.S. 79 (1986), with regard to a peremptory challenge exercised by the State. In an initial review order (Doc. 8), I found that Harper's petition was timely filed and that he had properly exhausted his claims in the state court system. Doc. 8 at 4. I further granted Harper's motion (Doc. 3) to appoint counsel and allowed his amended petition to proceed. *Id*. at 6. The respondent then filed the present motion to dismiss, arguing that Harper has failed to state a claim upon which relief may be granted. Doc. 16 at 1-2; Doc. 19 at 2.

### III.     MOTION TO DISMISS STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)], the pleading standard

3

> Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

Courts assess "plausibility" by "'draw[ing] on [our own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937). Courts "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Id.* (citation omitted). While factual plausibility is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable legal theory, such as failure to comply with the applicable statute of limitations or procedural requirements. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Int'l, Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

In deciding a motion brought pursuant to Rule 12(b)(6), the court may consider certain materials outside the pleadings, including (a) "the materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint,'" *Whitney*, 700 F.3d

at 1128 (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003)), and (b) "'materials that are part of the public record or do not contradict the complaint.'" *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). Thus, the court may "consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." *Miller*, 688 F.3d at 931 n.3 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

## IV. ANALYSIS

### A. *Habeas Corpus Standards*

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). However, 28 U.S.C. § 2254 "sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Section 2254(a) provides that a federal court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A federal court's review of a state court decision under § 2254 is deferential. *Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003). A state court decision on the merits should not be overturned unless it:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## B. Harper's Claims

### 1. The McCoy Claim

Harper alleges that he disagreed with his trial counsel's strategy to concede guilt, violating his Sixth Amendment right to control his defense. Doc. 9 at 6. Two United States Supreme Court cases, *Florida v. Nixon,* 543 U.S. 175 (2004) and *McCoy v. Louisiana,* 138 S. Ct. 1500 (2018), provide a useful framework for determining whether a strategy of conceding guilt violates a defendant's right to control his or her defense.

In *Nixon*, the defendant's trial counsel was convinced that the State possessed overwhelming evidence of Nixon's guilt for a grisly murder. *Nixon,* 543 U.S. at 556-57. This evidence included a detailed confession, several witnesses and forensic evidence. *Id.* at 556. After plea negotiations broke down, Nixon's counsel determined that the best chance of avoiding the death penalty was to concede Nixon's guilt during the guilt phase of the trial in hopes of bolstering his credibility when he asked for leniency in the penalty phase. *Id.* at 557. Counsel tried explaining this strategy to Nixon on at least three occasions but Nixon was "generally unresponsive during their discussions" and "never verbally approved or protested [trial counsel's] proposed strategy." *Id.* Leading up to the trial, Nixon did not provide counsel with direction in preparing his case and counsel decided to pursue the strategy of conceding guilt. *Id.* In holding that Nixon's Sixth Amendment right to control his defense had not been violated, the Supreme Court stated:

> When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard,

6

that is the end of the matter; no tenable claim of ineffective assistance would remain.

*Id.* at 563.

In *McCoy,* "the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *McCoy,* 138 S. Ct. at 1505. Importantly, the defendant was informed by his lawyer two weeks before trial that he was considering a strategy of conceding guilt to gain leniency at the sentencing stage and the defendant was furious, instead urging counsel to "pursue acquittal." *Id.* at 1506. Despite this "intransigent and unambiguous objection," counsel conceded to the jury that McCoy was guilty of the three murders. *Id.* at 1505-10. During opening statements, when counsel first conceded McCoy's guilt, McCoy protested that his lawyer was "selling [him] out." *Id.* at 1506.

Under these circumstances, the Supreme Court held that counsel's concession of guilt violated McCoy's Sixth Amendment right to control his own defense. *Id.* at 1512. In reaching this holding, the Court contrasted McCoy's objections with Nixon's lack of response, stating that "McCoy, in contrast, opposed [trial counsel's] assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.* at 1509.

In distinguishing Harper's claim from *McCoy*, the Iowa Court of Appeals stated:

> As the State points out, Harper was no shrinking violet during the trial court proceedings. He filed several pro se requests for a new attorney and was not shy about speaking up during pretrial hearings. Tellingly, after the trial was over, Harper did raise an issue about his attorney's performance with the district court—but it wasn't about the concession of guilt. Instead, when given the chance to say something at the hearing on his motion for a new trial, Harper focused on counsel's failure to inform him about a plea offer from the State. And at the sentencing while exercising his right of allocution, Harper questioned the court: "I would like to understand how I didn't … get a new trial … just for the simple fact that my lawyer didn't tell me about the deal that was offered before the trial." We accordingly view Harper's testimony at the postconviction hearing that his counsel "took it upon himself to admit my guilt when he knew that wasn't my trial

7

strategy" with some skepticism. This is especially so considering the various other statements Harper made at the postconviction hearing suggesting that what he viewed as "trial strategy" was merely an expectation that his counsel would "go to trial to prove that it wasn't [him]." On this bare-bones record, we cannot draw the inferences that Harper urges.

The second problem is that Harper's claim does not fit within the parameters of the Supreme Court's structural-error analysis on which he seeks relief. The *McCoy* Court set the stage for its decision by contrasting the facts of *Nixon* with the facts before it. In doing so, the Court signaled that the pertinent inquiry in the context of an alleged violation of a defendant's protected autonomy right is whether the defendant "adamantly objected" to the admission of guilt or, inversely, neither objected nor consented. The Court in *McCoy* took pains to describe the nature of the objection in the case before it, describing McCoy's objections to any concession of guilt as "vociferous," "adamant[]," "intransigent," "unambiguous," "repeated," "intractable," "strenuous," and "insistent." Nothing close appears in the record before us.

*Harper,* 2022 WL 1100280 at *6 (internal citations omitted). The court then stated:

What complicates this case above all else is that there is simply no evidence that Harper and his counsel ever discussed trial strategy, let alone had "intractable disagreements about the fundamental objective of [Harper's] representation." *See id.* at 1510. At most, we have a record that shows Harper and his counsel were on the same page about denying Harper's identity in the surveillance video up until the close of all the evidence. While this might suggest that counsel changed or developed the trial strategy after the State's case-in-chief and therefore had a duty to discuss it with Harper in advance, *see Nixon*, 543 U.S. at 189, that does not translate into a McCoy violation. *See, e.g., United States v. Felicianosoto*, 934 F.3d 783, 787 (8th Cir. 2019) (rejecting McCoy claim where the record did not reflect that the defendant "made any 'express statements of [his] will to maintain innocence' in response to his attorney's concessions, either to his counsel or the court" (citing *McCoy*, 138 S. Ct. at 1509)); *People v. Bernal*, 256 Cal. Rptr. 3d 269, 275 (Cal. Ct. App. 2019) (interpreting McCoy to "require express disagreement with counsel for a claimed constitutional violation to have merit in this context" and finding no such violation where the record did not show the defendant "instructed counsel not to concede guilt on the relevant charges in closing argument, nor did he ask to replace appointed counsel because of disagreement over trial strategy").

8

*Harper,* 2022 WL 1100280 at *7.

Harper is entitled to relief under § 2254 only if the Iowa Court of Appeals either unreasonably applied clearly established Federal law or unreasonably determined the facts based on the evidence presented at the state court level. *See* 28 U.S.C. § 2254(d). Harper has not established either of these propositions. The Iowa Court of Appeals accurately explained the Supreme Court's framework, as established in *Nixon* and *McCoy*, for cases involving trial counsel's concession of guilt. As the court noted, a complicating factor in this case is "that there is simply no evidence that Harper and his counsel ever discussed trial strategy, let alone 'had intractable disagreements about the fundamental objective of [Harper's] representation.'" *Harper,* 2022 WL 1100280 at *7. The Iowa Court of Appeals' interpretation of *McCoy* as requiring evidence of express, contemporaneous disagreement with trial counsel's concession of guilt was reasonable and is supported by Eighth Circuit law. *See Harper,* 2022 WL 1100280 at *7 (citing *United States v. Felicianosoto,* 934 F.3d 783, 787 (8th Cir. 2019)). As such, I find that the Iowa Court of Appeals did not unreasonably apply established Federal law. 28 U.S.C. § 2254(d)(1).

Further, the Iowa Court of Appeals did not base its ruling on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court noted the difficulty in applying the *Nixon* and *McCoy* framework to Harper's case based on the limited factual record developed about any strategic discussions between Harper and his trial counsel. Based on the record before it, the Iowa Court of Appeals found relevance in the fact that "Harper was no shrinking violet during the trial court proceedings" and made any complaints he had throughout his trial known to the trial court. *Harper,* 2022 WL 1100280 at *6.

The Iowa Court of Appeals further noted that Harper raised issues about his trial counsel's performance at a hearing on his motion for new trial but, instead of complaining about his counsel's concession of guilt, Harper focused on "counsel's failure to inform him about a plea offer from the State." *Id.* Moreover, during his sentencing allocution, Harper continued to focus on the lack of notice regarding a plea offer and did not mention

9

any displeasure with the concession of guilt strategy. *Id.* Based on this record, it was not unreasonable for the Iowa Court of Appeals to decline to infer that Harper's counsel had conceded his guilt over his "intransigent objection," as required for a *McCoy* violation. *McCoy,* 138 S. Ct. at 1510.

For these reasons, Harper has failed to state a plausible claim upon which relief may be granted with regard to his *McCoy* claim. As such, that claim must be dismissed. *See* FED. R. CIV. P. 12(b)(6).

### 2. The *Batson* Claim

Harper alleges that the prosecutor's peremptory strike of the only African-American member of the jury panel violated his equal protection rights " by unreasonably and contrarily apply[ing] clearly established federal law as held in *Batson v. Kentucky,* 476 U.S. 79 (1986)." Doc. 9 at 8. Harper states that the prosecutor testified at the PCR trial that he provided inaccurate information at the original trial regarding the stricken juror's criminal background and that the prosecutor admitted to not striking other jurors with similar criminal backgrounds. Doc. 20 at 2.

The Iowa Court of Appeals addressed this claim as follows:

> A *Batson* challenge follows three steps. First, the defendant must make a prima facie showing that the State used its peremptory challenges to exclude prospective jurors on the basis of race. *State v. Knox,* 464 N.W.2d 445, 448 (Iowa 1990). Second, the burden then shifts to the State to provide "a clear and reasonably specific and neutral explanation for the peremptory challenge." *Id.* And third, the court must decide whether purposeful discrimination exists based on the reasons presented by State. *Id.*
>
> The issue here is narrow in that Harper challenges only the postconviction court's determination of purposeful discrimination rather than the one reached by the original trial court. According to Harper, the postconviction court erred in finding the State provided a race-neutral reason for striking A.C., an African American woman and the sole prospective juror who was of the same race as Harper. In support, Harper points to the more developed record in the postconviction proceeding, which reveals that the

prosecutor in his criminal case clarified some statements he made when articulating his race-neutral reasons before the trial court.

At that time, the prosecutor offered two main reasons for striking A.C. from the jury panel: (1) she was the only potential juror with "a prior domestic abuse conviction"; and (2) she was the only one the prosecutor had personally prosecuted while he was an assistant county attorney with the Black Hawk County Attorney's Office. He elaborated:

> I remember prosecuting [A.C.'s] domestic abuse a few years ago. I struck her because this was obviously an assault-related case, I didn't want anyone with assault convictions on the panel, nor anyone that I personally have prosecuted or frankly even that the office had prosecuted while I was there. It was because of the assault domestic abuse conviction that she was stricken.

Convinced by the prosecutor's first explanation, the trial court overruled Harper's *Batson* challenge. The court reasoned that it was not improper for the prosecutor "to strike a potential juror who ha[d] assaultive history and ha[d] a prior conviction for assault, since this is an assault case."

On postconviction relief, Harper claimed "the State violated [his] equal protection and due process rights by providing false information to the court to survive his *Batson* challenge." The prosecutor was subpoenaed to testify at the postconviction-relief hearing, where he admitted upon reviewing the relevant files that he had made a mistake in stating A.C. had a prior conviction for domestic abuse assault. The prosecutor reflected, "I have since discovered that that was not accurate, it was negotiated down, but it began as a domestic abuse complaint." He also acknowledged that two other potential jurors had prior convictions as well, although they were unrelated to any violent crimes. Plus, one of them had disclosed a "bad personal incident" with the then-county attorney during voir dire, yet still ended up serving on the jury.

Now on appeal, Harper argues the prosecutor's misstatements "undermine[d] a finding that the use of the peremptory challenge was race neutral." Even with the benefit of a fuller record, the postconviction court was not swayed by Harper's argument, and neither are we. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York,* 500 U.S.

11

> 352, 360 (1991). Because the reasons offered by the prosecutor were facially valid given the facts of Harper's criminal case and thus race neutral, we decline to disturb the postconviction court's ruling. *See State v. Griffin,* 564 N.W.2d 370, 375 (Iowa 1997) (noting the race-neutral explanation must be "related to the particular case to be tried" (quoting *Batson*, 476 U.S. at 98)); see also *State v. Veal,* 930 N.W.2d 319, 334 (Iowa 2019) (recognizing juror's prior interaction with legal system constitutes a valid, race-neutral reason).

*Harper,* 2022 WL 1100280 at *7-8. Harper argues that the full PCR record establishes that the prosecutor's reasons for striking the sole African-American juror were not race-neutral and thus violated *Batson*. Doc. 20 at 2. However, the Iowa Court of Appeals neither unreasonably applied the law nor unreasonably determined the facts regarding Harper's case.

The respondent suggests that the prosecutor's statements regarding the stricken juror were more nuanced than Harper's argument allows. I agree. While the prosecutor did misstate the exact nature of the stricken juror's conviction at the original trial, the prosecutor testified in the PCR proceedings that he had taken this information from the stricken juror's own jury questionnaire and relied on this information in striking the juror, as he did not want a juror serving who he or his office had prosecuted. Doc. 14-9 at 15-16. The Iowa Court of Appeals found that there was no "discriminatory intent … inherent in the prosecutor's explanation" and the explanation was thus race neutral. *Harper,* 2022 WL 1100280 at *7-8 (quoting *Hernandez v. New York,* 500 U.S. 352, 360 (1991)). This finding was not an unreasonable application of clearly established federal law as established in *Batson*.

Harper also points to prior convictions of jurors who ultimately served on the jury to argue that the prosecutor's reasons for striking the juror were not race-neutral. Doc. 20 at 2. However, as the prosecutor testified, the other convictions did not involve violent conduct. *Harper,* 2022 WL 1100280 at *8. The Eighth Circuit has previously stated that "[e]ven fine race-neutral distinctions between [jurors] are a permissible basis for strikes." *Taylor v. Roper,* 577 F.3d 848, 866 (8th Cir. 2009). I find that the difference

12

between a background of violent behavior, even violent behavior that does not result in an actual assault conviction, is distinct enough from a background of non-violent convictions to qualify as a race-neutral distinction, especially with regard to a trial about violent conduct. Thus, I find no reason to disturb the PCR court's finding that the prosecutor struck the sole prospective African-American juror for race-neutral reasons. *Harper,* 2022 WL 1100280 at *8. The Iowa Court of Appeals reasonably determined the facts surrounding the strike based on the PCR record and reasonably applied the facts to clearly-established federal law.

For these reasons, Harper has failed to state a plausible claim upon which relief may be granted with regard to his *Batson* claim. As such, that claim must be dismissed. *See* FED. R. CIV. P. 12(b)(6).

## V.     CERTIFICATE OF APPEALABILITY

A certificate of appealability may be granted only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336–37 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076–77 (8th Cir. 2000); *Mills v. Norris*, 187 F.3d 881, 881 n.1 (8th Cir. 1999); *Carter v. Hopkins*, 151 F.3d 872, 873–74 (8th Cir. 1998); *Ramsey v. Bowersox*, 149 F.3d 749, 759 (8th Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox*, 133 F.3d at 569. Thus, "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Similarly, when a federal habeas petition is dismissed on procedural grounds without reaching the underlying constitutional claim, "the [movant must show], at least, that jurists of reason

13

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *See Slack*, 529 U.S. at 484.

Having thoroughly reviewed the record in this case, I find Harper failed to make the requisite "substantial showing" with respect to his § 2254 petition. *See* 28 U.S.C. § 2253(c)(2); FED. R. APP. P. 22(b). Because he does not present a question of substance for appellate review, a certificate of appealability will not issue. If Harper desires further review of his § 2254 petition, he may request the issuance of the certificate of appealability by a circuit judge of the United States Court of Appeals for the Eighth Circuit in accordance with *Tiedeman v. Benson*, 122 F.3d 518, 521 (8th Cir. 1997).

## VI. CONCLUSION

As explained herein, each ground asserted in Ramon Harper's amended petition (Doc. 9) under 28 U.S.C. § 2254 fails to state a claim upon which relief can be granted. As such, the respondent's motion (Doc. 16) to dismiss is **granted**. The amended petition (Doc. 9) is **denied** and this action is **dismissed with prejudice**. A certificate of appealability shall **not issue**.

**IT IS SO ORDERED** this 20th day of March, 2024.

_____
Leonard T. Strand
United States District Judge